## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

Caleb Grant,

     Plaintiff,

     v.                        Case No. 23CV551

Deputy DANIEL KROLIKOWSKI ET AL.,

     Defendants.

## BRIEF IN SUPPORT
## MOTION TO ALTER OR AMEND A JUDGMENT OPINION & ORDER OF 3/17/25

Plaintiff respectfully moves this Court under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend the judgment entered in this matter on March 17, 2025 (Orders 1, 3, & 4), on the grounds of newly discovered evidence that could not have been raised prior to judgment and which materially affects the outcome of the case.

Under Rule 59(e), reconsideration is appropriate to account for newly discovered evidence or to prevent manifest injustice. Here, the Plaintiff has uncovered evidence—after the dispositive motion deadline but before the close of discovery—that Defendant Deputies were not lawfully appointed public officers due to failure to take and file valid written oaths of office, as required by Wisconsin law. This directly undermines the legitimacy of their actions under color of law and raises serious constitutional issues under both state and federal standards.

### A. Oaths of Public Officers in the State of Wisconsin

In the request for production of 12/18/24 to respondents: Krolikowski, Messner, Breunig, Knull, defendants acknowledged they have no signed Oath of Office for their position as Sauk

County Sheriff Deputy.  The response is dated on 12/18/2024.   The request was "For each of the respondent's please send a copy of their signed (by the respondent) Oat[h] of Office for their position as Sauk County Sheriff Deputy, that was current for the dates of 4/6/2023 through 5/18/2023.  The response:

> […] "Upon diligent search and reasonable inquiry the Defendants are not in possession of individual signed oaths for Deputy Alex Breunig, Deputy Steven Messner, Deputy Erik Knull and Deputy [D]aniel Krolikowski for the time period requested. […] (Exhibit A pg 4)

Speaking on this same issue, on 6/10/2024, Sauk County ADA Arevalo in court speaking of these same defendants stated, […]

> "I'm not sure based on information that I've gathered that Sauk County law enforcement officers sign a physical oath. I'm not sure if -- I know that they swear an oath, and I can certainly -- I'm sure they could provide the – the language that is -- that each of them are sworn in with, but I'm not sure that each individual officer signs a particular document that contains an oath. (Exhibit B, Trans pg 16 ln. 21 through pg 17 ln 3.)

If these defendants do have a written oath of office it was incumbent upon them to locate and present them when requested. Rule 34 states that the responding party is to produce, for inspection, copying items in the responding party's possession, custody, or control the designated documents, in this case their Oaths of Office for Deputy Sheriff.   Wis. Stat. 19.01(1m) allows for a spoken oath in addition to the written, but the written is absolutely required.   An Open Record Request was made regarding the oaths of office for these deputies. Plaintiff has personally asked for them at the Sheriff's office and the County Clerks office for Oaths of Office.  The only documentation that was ever given is the same as what the Defendants have given.(Exhibit A) The Deputy Defendants do not have possession or control of any signed Oaths to present to Plaintiff because they do not exist.

Wis. Stat. § 59.26 grants the sheriff the authority to appoint deputy sheriffs. Since deputy sheriffs are appointed by the sheriff to perform official duties on behalf of the sheriff, the position is considered a public office within the scope of the law.

In this motion to reconsider, plaintiff is challenging the defendant deputy sheriffs and deputy Does authority and whether they occupied the public office of Deputy Sheriff of Sauk County and the role that defendant Sauk County has in making sure it's deputies are properly seated in their public office per Wis. State. § 19.01 which states in relevant part:

**Oaths and bonds.**

**(1)** Form of oath. Every official oath required by article IV, section 28, of the constitution or by any statute **shall be in writing, subscribed and sworn to** […] (emphasis added)

Wisconsin Statutes require public officers, including deputy sheriffs, to take and file a written oath before performing the duties of the office.  Failure to do so means the deputy has not legally assumed the office of deputy sheriff, and any actions taken by the deputy in the course of their duties are deemed invalid.  If the deputy sheriff has not taken the required oath, their actions would be outside the scope of their legal authority as deputy sheriffs.

Wis. Stat. §19.01 is clear in its requirement. The deputies' refusal to disclose whether they took the oath further supports the claim that they have not lawfully assumed the office.

Chapter 59 of Wis. Stats. applies to County Officers as declared in Dietrich v. Waldo by the Court of Appeals District III. (**Dietrich v. Wildo,** No. 97-3204, *Wis. Ct. App.* (May 12, 1998))

**Deputy Sheriffs are Appointed Public Officers**

The Wis. Stat. § 59.26 grants the sheriff the authority to appoint deputy sheriffs. Since deputy sheriffs are appointed by the sheriff to perform official duties on behalf of the sheriff,

they are considered public officers within the scope of the law. The statute Wis. Stat. § 59.26 establishes Deputies as public officers within the sheriff's office, and as such, they are mandated to take the oath (written) of office under Wis. Stat. § 19.01.

**Wis. Stat. § 59.21   Official oaths and bonds.**
(1)  **Each county officer named in this chapter,** except county supervisors, **shall execute and file an official bond and take and file the official oath within 20 days after receiving official notice of election or appointment, or if not officially notified, within 20 days after the commencement of the term for which the officer is elected or appointed,** or the board may provide a schedule or blanket bond that includes any or all of these officials, except county supervisors, and a blanket bond may also include members of a county veterans service commission under s. 45.81 (1) and a county veterans service officer under s. 45.81 (2). Every county supervisor shall take and file the official oath within 20 days after receiving official notice of election or appointment, or if not officially notified, within 20 days after the commencement of the term for which he or she is elected or appointed. **Every deputy appointed by any such officer shall take and file the official oath and if the deputy neglects to do so, he or she shall forfeit $100.** If the board does not provide a schedule or blanket bond, the official bonds shall be in sums and with sureties, as follows:... (emphasis added)

Wis. Stat. § 17.03 (7) explains how a vacated office happens

(7)  **A person elected or appointed or reelected or reappointed to any office neglects or refuses to take and file the official oath or to execute or renew the official bond if required, or to file the oath or bond as prescribed by law.**  (emphasis added)

Failing to have a written Oath as mandated in the State of Wisconsin Statutes § 19.01

means that they cannot assume office or perform their duties such as making arrests, serving

warrants, and performing other duties as a Deputy Sheriff as the office was not occupied.

In a case like this, where the deputy refuses to provide evidence of having taken the

oath, the defendants are not eligible for the "de facto officer" status, where actions taken by the

officer who has failed to properly assume office may still be valid in certain circumstances.

Since the deputy never legally entered the office due to the failure to take the oath, the

defendants actions are without legal effect.   As per **Ryder v. United States, 515 US 177 -**

**Supreme Court 1995**, plaintiff is required to initiate a direct challenge to the authority of

anyone representing himself to be a government officer or agent *prior to the finality of any*

*proceeding in order to avoid implications of de facto* officer doctrine.  When challenged, those posing as government officers and agents are required to affirmatively prove whatever authority they claim.

> In *Buckley* v. *Valeo, supra,* at 125, we said "[t]he Appointments Clause could, of course, be read as merely dealing with etiquette or protocol in describing `Officers of the United States' but the drafters had a less frivolous purpose in mind." The Clause is a bulwark against one branch aggrandizing its power at the expense of another branch, but it is more: it "preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power." *Freytag* v. *Commissioner,* 501 U. S. 868, 878 (1991). In *Glidden Co.* v. *Zdanok,* 370 U. S. 530 (1962), we declined to invoke the *de facto* officer doctrine in order to avoid deciding a question arising under Article III of the Constitution, saying that the cases in which we had relied on that doctrine did not involve "basic constitutional protections designed in part for the benefit of litigants." *Id.,* at 536 (plurality opinion). We think that one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever 183*183 relief may be appropriate if a violation indeed occurred. Any other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments.
>
> (Ryder v. United States, 515 US 177 - Supreme Court 1995)

Since this case is still ongoing and the plaintiff asked the defendant Krolikowski at the event to confirm if he had an Oath of Office and Krolikowski refused to answer (Dkt 130-1 operative complaint at ¶ 45); and further, plaintiff has also asked for the oaths of Deputies and Deputy DOES in the production request to Sheriff Meister Dated 3/23/2024 of the defendant DOES. (Dkt 115-1 pg2); the actions of the defendant deputies are outside their legal authority. In the RFA's set 1 req 1 for defendants Krolikowski(Dkt 83-4) and Knull (Dkt 83-6), both affirmatively stated that they had an Oath of Office.  However, now they admit they do not have one to present.  This bolsters the position that there are no written oaths and the defendants can not claim to be a de facto officer because their authority has been called into question.  It also brings into question whether the deputies were operating under the color of law.

In **State ex rel. Fredrickson v. Wisconsin Local Government Property Insurance Fund (2000),** the court emphasized the necessity of meeting statutory requirements to legally perform duties associated with public office.

There are also federal cases that support challenges to public officer's authority, particularly concerning the failure to fulfill statutory requirements for assuming office, such as taking an oath.

**United States v. Davis, 245 F3d 982 (7th Cir. 2001)** where the reasoning in **Davis** can be applied to any situation where an officer is not in compliance with statutory or procedural requirements, which includes failing to take the oath of office. Actions performed by individuals not legally vested with authority can be challenged as invalid.

**United States v. Twigg, 588 F.2d 272 (3rd Cir. 1978)** The court examined whether a law enforcement officer had the authority to act based on procedural irregularities. While the case does not specifically address the failure to take an oath, it discusses the concept of authority and jurisdictional issues related to law enforcement actions, especially when the officer's legal authority is questioned.

**In re Oath of Office of Public Officers, 2 F. Supp. 2D 247 (D. Conn. 1998)** This case from the District of Connecticut specifically addressed the question of whether public officers could lawfully perform their duties when they failed to file or take an oath of office. The court held that failing to take the oath of office could result in the officer not being vested with legal authority to perform official duties. The relevance is: this case directly aligns with plaintiff's case. It supports the notion that without a proper oath as required in statutes, a public official (including a law enforcement officer like a deputy sheriff) cannot legally perform their duties.

**Andrews v. United States**, 2018 WL 4442686 (E.D. Wis. 2018): Clarified that an individual not properly appointed or authorized under law cannot exercise government authority.

- **Norton v. Shelby County**, 118 U.S. 425 (1886): "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." The Court held that acts by an individual who was never lawfully in office are void ab initio.

## LACK OF OATH SUMMARY

Without the written oath required by Wisconsin Statutes, the defendant deputy sheriffs never lawfully assumed the office and cannot act in the public office capacity of a deputy sheriff. This failure to fulfill a statutory requirement for office holding is an absolute requirement for them to perform the duties of law enforcement. Since the deputies have been challenged while the proceeding is ongoing, to provide their oaths and have failed or refused to do so, the doctrine of a de facto officer does not apply. The deputy cannot be considered to be legally holding the office because their authority has been directly contested, and the legal challenge is still ongoing. Every action the defendant deputies have taken or will take during the pendency of the case can be challenged based on the absence of the valid oath. This would include any law enforcement activity, enforcement of laws, or use of authority that a deputy sheriff would typically have from the point of contact with plaintiff. Also challenged would be any possible claim to immunity both qualified and absolute.

In **Ryder v. United States (1995)**:
[…]

> Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment. *Harlow* v. *Fitzgerald,* 457 U. S. 800, 806 (1982) ("[O]ur decisions consistently

have held that government officials are entitled to some form of immunity from *suits for damages* " (emphasis added)). Providing relief to a claimant raising an Appointments Clause challenge does not subject public officials to personal damages that represent a "potentially disabling threa[t] of liability," but only invalidates actions taken pursuant to defective title. The qualified immunity doctrine need not be extended to protect public officials from such attacks.

Similarly, the practice of denying criminal defendants an exclusionary remedy from Fourth Amendment violations when those errors occur despite the good faith of the Government actors, <u>United States</u> v. <u>Leon,</u> 468 U. S. 897 (1984), does not require the affirmance of petitioner's conviction in this case. Finding the deterrent remedy of suppression not compelled by the Fourth Amendment, *id.* , at 910, that case specifically relied on the "objectionable collateral consequence of [the] interference with the criminal justice system's 186*186 truth-finding function" in requiring a blanket exclusionary remedy for all violations, *id.* , at 907, and the relative ineffectiveness of such remedy to deter future Fourth Amendment violations in particular cases, *id.* , at 918-921. No similar collateral consequence arises from rectifying an Appointments Clause violation, and correcting Appointments Clause violations in cases such as this one provides a suitable incentive to make such challenges.

### B. ANALYSIS PORTION OF ORDER

In the ANALYSIS portion of the decision all representations and actions attributed to the Deputies in the ANALYSIS assume that they were occupying the office of Deputy Sheriff within the County of Sauk in Wisconsin.  They are not in the public office as shown above. The implications of the Deputies actions against Plaintiff in totality as not being lawful puts the full summary judgment of Grant back on the table. It would also appear that the Summary Judgment of Defendants would have to be re-evaluated with the deputies lacking authority. It would also seem that the first and second cause of action in the operative complaint are active against the Sauk County Defendants, including but not exclusively Defendant Sauk County, in a Monell claim such as this, can be held responsible for the actions of its staff as there appears there is a policy or custom of denial of persons constitutional rights due to a lack of authority (failure to occupy the public office).  In this case, it is the responsibility of the defendant (Sauk County) as well as Sheriff Meister who oversees the Deputies, to ensure that its employees are

in the public office necessary to perform the actions delegated to them. Allowing a de facto position of the deputies without oaths nullifies the rights of the legislature to make and enforce statutes as in Wis. Stat. § 19.01, § 59.21, § 59.26, if a de facto position is allowed once challenged. There appears to be a custom of not confirming the deputy sheriffs are compliant with the obligation of a signed oath of office per Wisconsin Statutes. When the defendant deputies were allowed to perform as if they were within the public office of Deputy Sheriff, it indicates a custom or practice (perhaps even a policy) of defendant Sauk County to allow it's employees to deprive the Constitutional rights of plaintiff without authority. It also appears that the lack of oaths is systemic to potentially all or most of the deputy sheriffs in Sauk County.

## C. Initial Disclosure FRCP 26(a) - Motion to Show Cause - Dkt 119
## (Not a Motion to Compel as Presented in Order)

From the outset, the Court made an error in denying the Plaintiff's right to initial disclosure, as reflected in Magistrate Crocker's declaration (see Dkt 60), which incorrectly stated that the Plaintiff, being "Pro Se," was not entitled to such disclosures. This error was identified by the Plaintiff, who promptly sought clarification by submitting a letter (Dkt 44) regarding the pretrial conference order (see Dkt 37) on **March 8, 2024**. Despite the Plaintiff's efforts, the situation was not remedied. On **April 18, 2024**, when a (corrected) motion to compel (Dkt 52) was filed after the Defendants failed to make their initial disclosures, the Sauk County Defendants (Dkt 53) responded by essentially refusing to engage in discovery and denying any obligation to provide initial disclosures unless the Court explicitly ordered them to do so. By this point, the Plaintiff had already made their initial disclosures.

The Court delayed ruling on this motion for **122 days**, until after dispositive motions

were due, which prejudiced the Plaintiff's ability to adequately prepare and respond to the Defendants' motions for summary judgment. The delay forced the Plaintiff to work with incomplete information in the midst of critical briefings. Defendants, on the other hand, were not harmed by this delay, as they were already in possession of the Plaintiff's initial disclosures.

In its order of **August 12, 2023** (Dkt 114), the Court set a deadline of **August 23, 2024**, for the completion of initial disclosures. This deadline fell directly in the middle of the briefing for the Summary Judgment motions, making it practically impossible for the Plaintiff to integrate the late-disclosed materials into the required filings. This timing, along with the Defendants' failure to provide complete disclosures, constitutes significant harm to the Plaintiff. Additionally, the Defendants failed to produce several items (specifically items 25-32), which they claimed would only be provided if a protective order was filed with the Court—yet no such order has been submitted (Dkt 155-1, pg. 5).

On **August 26, 2024**, the Defendants supplemented their disclosures, providing only **322 pages** of partial information—three days late. Despite this partial compliance, no meet and confer was held, and the Plaintiff had no meaningful opportunity to address these deficiencies prior to filing a Motion to Show Cause (Dkt 119). The motion detailed the items that were still incomplete or withheld by the Defendants, such as the failure to provide an insurance agreement (Rule 26(a)(1)(A)(iv)) and the failure to execute a protective order for the manuals and other items they had not yet produced.

When the Court denied the motion to show cause (Dkt 119), it cited two reasons:

1. **No Meet and Confer**: The Court reasoned that the Plaintiff did not initiate a meet and confer. However, this requirement was thwarted early in the case, as previously discussed. Under **FRCP Rule 26**, the parties were obligated to provide initial

disclosures without a formal discovery request. The Plaintiff attempted to address the issue through a motion to compel (Dkt 52), but the Court delayed acting on it for **116 days**, only ordering the Defendants to provide initial disclosures after the dispositive motions had been filed. The delay in issuing the order effectively denied the Plaintiff access to necessary information in time for summary judgment preparation. The Court's failure to act swiftly suggests an appearance of bias, particularly against a pro se litigant.

2. **Lack of Prejudice to Plaintiff**: The Court further argued that the Plaintiff was not prejudiced by the missing manuals because the claims being dismissed (traffic-stop and arrest-based claims) were not dependent on these documents. However, this assessment disregards the Plaintiff's affidavit (Dkt 47, pg 3), which clearly indicates that these materials might contain critical information regarding the policies and procedures of the Defendants, particularly relevant to claims such as **malicious prosecution**. The Court's conclusion that these documents were irrelevant appears premature and speculative, as they have never been reviewed by the Court.

Additionally, the Court stated that the Defendants had disclosed almost everything required, with the exception of portions of the county's policy manuals. This is factually incorrect, as **Rule 26(a)(1)(A)(iv)**—which requires the disclosure of insurance agreements—was never fulfilled. The Defendants referenced it, stating they would provide it when they received it, but no follow-up occurred. Despite repeated requests, including one made during a meet and confer on **March 27, 2025**, the Defendants have still not provided this information.

The Court also noted that the Plaintiff had been given "almost everything," but ignored the ongoing withholding of documents critical to the Plaintiff's case. As the Court acknowledged in its order, the **personnel files** and **training records** for various Defendants,

along with the **Sauk County Custody Manual** and **Sauk County Sheriff's Office Policy Manual**, may be highly relevant to the **malicious prosecution** claim. Denying access to these documents without justifiable reasons constitutes an abuse of discretion and a violation of due process.

Furthermore, the Court's reliance on the Defendants' representations that they would provide these materials when they received them does not excuse their failure to comply with the disclosure requirements. Ignorance of the rules is not an excuse for noncompliance. The ongoing delay in providing these documents has prejudiced the Plaintiff's ability to prepare and respond to summary judgment motions and other pleadings.

**Conclusion**:

The Plaintiff has been significantly prejudiced by the Court's handling of the initial disclosure process, which has been exacerbated by the Defendants' failure to comply with the Court's orders. The delays and incomplete disclosures have hindered the Plaintiff's ability to fully participate in the litigation process, including the ability to effectively respond to dispositive motions.

The Plaintiff respectfully requests that the Court reconsider its denial of the motion to show cause (Dkt 119) and reverse the decision, taking into account the Defendants' failure to comply with **Rule 26(a)** and the Court's own orders regarding initial disclosures (Dkt 114). The Plaintiff also seeks appropriate remedies for the ongoing denial of complete and timely disclosures.

### D. UNDISPUTED FACTS ARE DISPUTED

The court begins by stating, "The following facts are undisputed unless otherwise

noted." The very first line of undisputed facts states, "Plaintiff Caleb James Grant lives in Reedsburg, Wisconsin." The court fails immediately in that this fact **is disputed** as per the rules laid out by the court in the Summary Judgment Procedure rules. Plaintiff objects to the use of the term "lives" as it is undefined and is never used in any of the Proposed Findings of Facts (PFOF) in either Defendant's or Plaintiff's and is therefore inappropriate to be used and proclaimed as an undisputed fact. In Defendants PFOF, at Dkt 136 item 1, proposes, "Plaintiff Caleb James Grant ("Grant") is an adult **resident** of the State of Wisconsin with an address of E7973A Beth Road, Reedsburg, Wisconsin." the response to this is: "**Disputed**. No citation is provided and is therefore not admissible." No extra information was necessary per the courts instructions in their Summary Judgment Procedures sent on 10/17/2023 per Docket information. The proposed fact is clearly identified as disputed and it is clearly stated that there is no citation and therefore is inadmissible based page 5 of the Summary Judgment Procedure Rules E. (Evidence).

> E. Evidence
>
> Every factual proposition, whether made in support of or opposition to, a motion for summary judgment **_must_** be supported by admissible evidence. The court will not search the record for evidence. Supporting evidence should be clearly cited and submitted as described in I.C.2. (emphasis added)

These were the rules set by the court.

The use of the term "resident" in the Defendants PFOF item 1 (unsupported with citations so therefore is inadmissible) is actually challenged in a parallel PFOF, of plaintiff, in his reply document (Dkt 139 item 2). The reply clearly disputes and explains that in Plaintiff's cited Dkt 47, (the unrebutted and verified Affidavit) clearly defines the status of Caleb James Grant in regards to his "Domicile" and clearly establishes him as a non-person and non-resident

according 8 U.S.C. § 1101(a)(21), and qualifies even further in the affidavit (ibid.).  There is nothing before the court that opposes the verified affidavit. It is a legal maxim that "unrebutted affidavits stand as truth."  If this court considers the sources used in the verified Affidavit (Dkt 47) to be not credible it needs to reveal how it came to that assessment.

Regarding his affidavit, Plaintiff has the right to freedom of association (First Amendment) and uses extensive legal authorities in his affidavit to clearly testify to his choice of Domicile:

> If you [the court] have questions, I would be happy to answer them under penalty of perjury if you like, so long as your questions and your interpretation of this submission leading to the questions are also submitted in writing under penalty of perjury." "This form constitutes testimony of a witness and any attempt to coerce non-submission or change its content without supporting court admissible evidence on your part is criminal witness tampering." (ibid. pg 1)

Defendants had 30 days to rebut the affidavit which they have chosen not to do.

Usage of the term "lives" by the court is objectionable.  Use of this undefined word is classic equivocation and an informal logical fallacy.  It is the misleading use of a term with more than one meaning or sense (by glossing over which meaning is intended at a particular time).  It generally occurs with polysemic words (words with multiple meanings) and is a "general expression" and does not define the context implied.  Is the court implying that plaintiff is a resident and domiciled within Reedsburg, WI and that he is a statutory "citizen"? Or perhaps that plaintiff was a transient foreigner and lived at a location? Or some other context.  "General expressions" are susceptible to two or more contexts or interpretations, one of which this court has and is advantaging the defendants with:  the judge's own political assignment of plaintiff's status.  Meaning: the court intends to say that plaintiff is a "resident" and "domiciled" within the State of Wisconsin at the address above.  This is a conclusive presumption and is unsupported by any evidence and thereby violates the due process of

plaintiff. (ibid.) The court would need evidence that plaintiff is a statutory citizen in the way of proving he is a resident and that he is domiciled in the State of Wisconsin (which is impossible as plaintiff has declared his domicile and it is not in the State of Wisconsin and not on Federal Territory). No evidence of this sort is before the court. There is evidence in the form of a sworn affidavit that plaintiff is a nonresident and nonperson and is domiciled outside the State of Wisconsin and outside the United States (Federal Territories) (ibid.)

The effects of a domicile outside the State of Wisconsin and outside the Federal Territories is that plaintiff is not a citizen of Wisconsin nor of the United States

> **domicile.** A person's legal home. That place where a man has his true, fixed, and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning. Smith v. Smith, 206 Pa.Super. 310, 213 A.2d 94. Generally, physical presence within a state and the intention to make it one's home are the requisites of establishing a "domicile" therein. The permanent residence of a person or the place to which he intends to return even though he may actually reside elsewhere. A person may have more than one residence but only one domicile. The legal domicile of a person is important since it, rather than the actual residence, often controls the jurisdiction of the taxing authorities and determines where a person may exercise the privilege of voting and other legal rights and privileges. The established, fixed, permanent, or ordinary dwellingplace or place of residence of a person, as distinguished from his temporary and transient, though actual, place of residence. It is his legal residence, as distinguished from his temporary place of abode; or his home, as distinguished from a place to which business or pleasure may temporarily call him. See also Abode; Residence.
> [Black's Law Dictionary, Sixth Edition, p. 485]

Merely stating that arguments are "long-discredited" is Ad Hominem and weak, as well as out of order for an Article III Federal Court. The court is appealing to authority of some sort or consensus of imaginary experts and assumes without evidence presented to it. Dismissing four of the five amendment violations is without merit and having the appearance of an immoral labeling of this non-represented plaintiff. The labeling brings harm and slanders him by associating him with the slanderous term used in a McCarthyistic fashion to cancel actual arguments. In the mischaracterization of the plaintiff by Judge Peterson he states, "his apparent

belief that the laws of Wisconsin don't apply to him", the court slanders plaintiff by stating plaintiff believes that criminal laws without an injured party do not apply to him and it does so without evidence or that the common law and the constitution does not apply to him. This is conclusive presumption and is a violation of due process. **"Expressio unius est exclusio alterius" Translation:** *The expression of one thing is the exclusion of another.* Further, Judge Peterson uses PFOF of Dkt 102 ¶ 57, [he] "is completely private and separate from the State of Wisconsin and has no franchise contract with it including but not limited to a drivers license", in an attempt to mischaracterize plaintiff into some imaginary category called "sovereign citizen" by the court, and violates due process. (Also Dkt 157 pg 8)

There has been no evidence that shows that plaintiff has agreements with the State of Wisconsin and that is just factually true, plaintiff puts the court to the proof of it's contention that plaintiff is not completely private. The Wisconsin DMV denies plaintiff a license due to plaintiff not having a federally issued number (SSN) to place onto the application (Dkt 138 sworn affidavit of plaintiff) that is tied to plaintiff and is evidence of no agreement with the State. In plaintiffs Affidavit (Dkt 47), it is plaintiff's sworn testimony (ibid. pg 13) that he has NO contracts with the State of Wisconsin and to alter that testimony is unlawful as it is uncontested. (ibid. pg 4) The claim that there is an obligation owed by plaintiff to the State of Wisconsin, as there was no injury caused by plaintiff at the stops of alleged officers, no crime as evidenced that the accusation of defendants was dismissed, and would depend on a contract with the State if there was a legitimate civil matter. This court has no evidence of such a contract. If the defendants believe such a contract exists it is required for them to produce such a contract. On page 12 of Dkt 157, the court quotes Atwater, "if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment arrest the offender". It is plaintiff's

contention as thoroughly documented in his affidavit (Dkt 47) that the Wis. Stats. do not apply to him because of his status as a nonresident, nonperson and domiciled outside the State of Wisconsin and U.S. Federal Territories. The defendants and the court have had ample time to review the document and rebut properly under penalty of perjury but have chosen not to and are now estopped from doing so.

Addressing the subject of Domicile as identified in Dkt 47. The U.S. Supreme Court has ruled that no government may dictate plaintiff's choice of political affiliations, as revealed in the American Jurisprudence Legal Encyclopedia:

> "The right to associate or not to associate with others solely on the basis of individual choice, not being absolute, [1] may conflict with a societal interest in requiring one to associate with others, or to prohibit one from associating with others, in order to accomplish what the state deems to be the common good. **The Supreme Court though rarely called upon to examine this aspect of the right to freedom of association, has nevertheless established certain basic rules which will cover many situations involving forced or prohibited associations.** Thus, where a sufficiently compelling state interest, outside the political spectrum, can be accomplished only by requiring individuals to associate together for the common good, then such forced association is constitutional. [2] **But the Supreme Court has made it clear that compelling an individual to become a member of an organization with political aspect, or compelling an individual to become a member of an organization which financially supports, in more than an insignificant way, political personages or goals which the individual does not wish to support, is an infringement of the individual's constitutional right to freedom of association.** [3] The First amendment prevents the government, except in the most compelling

---

1 § 539.
2 Lathrop v. Donohue, 367 U.S.820, 81 S.Ct 1826, 6 L.Ed.2d. 1191 (1961)reh'g denied, 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d. 72 (1961) (a state supreme court may order integration of the state bar); Railway Emp. Dept. v. Hanson, 351 U.S. 225, 76 S. Ct. 714, 10990 L.Ed. 1112 (1956), motion denied, 351 U.S. 979, 76 S. Ct. 1044, 190 L.Ed. 1494 (1956) and reh'g denied, 352 U.S. 859, 77 S.Ct. 22, 1 L.Ed.2d. 69 (1956) (upholding the validity of the union shop provision of the Railway Labor Act).
The First Amendment right to freedom of association of teachers was not violated by enforcement of a rule that white teachers whose children did not attend public schools would not be rehired, Cook v. Hudson, 511 F.2d 744, 9 Emp. Prac. Dec. (CCH) ¶ 10134 (5th Cir. 1975), reh'g denied, 515 F. 2d. 762 (5h Cir. 1975) andcert. Granted, 424 U.S. 941, 96 S. Ct. 1408, 47 Led.2d. 347 (1976) and cert. Dismissed, 429 U.S. 165, 97 S Ct. 543, 50 L.Ed.2d 373, 12 Empl. Prac. Dec. (CCH) ¶ 11246 (1976).
3 Rutan v. Republican Party of Illinois, 497 U.S.. 62 110 S.Ct. 2729, 111 L.Ed.2d. 52 I.E.R. Cas. (BNA) 673 (1990), reh'g denied, 497 U.S. 1050, 111 S.Ct. 13, 111 L.Ed.2d. 828 (1990) and reh'g denied, 497 U.S. 1050, 111 S.Ct. 13, 111 L.Ed.2d. 828 (1990) (conditioning public employment hiring decisions on political and associoation violates the First Amendment rights of applicaions in th eabsence of some vital goveerinmental interest).

circumstances, from the wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate; it is not merely a tenure provision that protects public employees from actual or constructive discharge. [4] This, First Amendment principles prohibit a state from compelling any individual to associate with a political party, as a condition of retaining public employment. [5] The First Amendment protects nonpolicymaking public employees from discrimination based on their political beliefs or affiliation. [6] But the First Amendment protects the right of political party members to advocate that a specific person be elected or appointed to a particular office and that a specific person be hired to perform a governmental function. [7] In the First Amendment context, the political patronage exception to the First Amendment protection for public employees is to be construed broadly, so as presumptively to encompass positions placed by legislature outside of "merit" civil service. Positions specifically named in relevant federal, state, county , or municipal laws to which discretionary authority with respect to enforcement of that law or carrying out some other policy of political concern is granted, such as a secretary of state given statutory authority over various state corporation law practices, fall within the political patronage exception to First Amendment protection of public employees. [8] However, a supposed interest in ensuring effective government and efficient government employees, political

---

4   Rutan v. Republican Party of Illinois, 497 U.S.. 62 110 S.Ct. 2729, 111 L.Ed.2d. 52 I.E.R. Cas. (BNA) 673 (1990), reh'g denied, 497 U.S. 1050, 111 S.Ct. 13, 111 L.Ed.2d. 828 (1990)

Annotation: Public employee's right of free speech under Federal Constitution's First Amendment-Supreme Court cases 97 L.Ed.2d. 903

First Amendment protection for law enforcement employees subjected to discharge, transfer, or discipline because of speech, 109 A.L.R. Red 9.

First Amendment protection for judges or government attorneys subjected to discharge, transfer, or discipline because of speech, 108 A.L.R. Fed. 117.

First Amendment protection for public hospital or health employees subjected to discharge, transfer, or discipline because of speech, 107 A.L.R. Red. 21.

First Amendment protection for publicly employed firefighters subjected to discharge, transfer, or discipline because of speech, 106 A.L.R. Fed. 396.

5   Abood v. Detroit Bd. Of Ed., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d. 261, 95 L.R.R.M. (BNA) 2411, 81 Lab. Cas. (CCH) ¶ 55041 (1977), reh'g denied, 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d. 1102 (1977); Parrish v. Nikolits, 86 F.3d. 1088 (11th Cir. 1996), cert. Denied, 117 S.Ct. 1818, 137 L.Ed.2d. 1027 (U.S. 1997).

6   LaRou v. Ridlon, 98 F.3d. 659 (1 st Cir. 1996); Parrish v. Nikolits, 86 F.3d. 1088 (11th Cir. 1996), cert. Denied, 117 S.Ct 1818, 137 L.Ed.2d. 1027 (U.S. 1997)

7   Vickery v. Jones, 100 F.3d 1334 (7th Cir. 1996), cert. Denied 117 S.Ct. 1553, 137 L.Ed.2. 701 (U.S. 1997).

Responsibilities of the position of director of a municipality's office of federal programs resembled those of a policymaker, privy to confidential information, a communicator, or some other office holder whose function was such that party affiliation was an equally important requirement for continued tenure. Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7 (1st Cir. 1996).

8   McCloud v. Testa, 97 F.3d. 1536, 12 I.E.R. Cas. (BNA) 1833, 1996 Fed.App. 335P (6th Cir. 1996), reh'g and suggestion for reh'g en banc denied, (Feb. 13, 1997).

Law Reviews: Stokes, When Freedoms Conflict: Party Discipline and the First Amendment. 11 JL & Pol 751, Fall, 1995.

Pave, Public employees and the First Amendment Petition Clause: Protecting the rights of Citizen-Employees Who File Legitimate Grievances and Lawsuits Against Their Government Employers. 90 NW U LR 304, Fall, 1995.

Singer, Conduct and Belief: Public Employees' First Amendment Rights to Free expression and Political Affiliation. 59 U Chi LR 897, Spring, 1992.

As to Political patronage jobs, see § 472.

affiliation or loyalty, or high salaries paid to the employees in question should not be counted as indicative of positions that require a particular party affiliation.
[9]
[American Jurisprudence 2d, Constitutional law, § 546: Forced and Prohibited Associations (1999)]

In order for someone to get a "drivers license" with the State of Wisconsin, he is required to associate with the Federal Government making a contract with them in order to have an SSN associated with him.  Forcing plaintiff to associate with the Federal Government in order to "drive" violates Plaintiff's choice of association and freedom to contract or not to contract and denies him his Constitutional right to travel by placing a condition upon the right.

**Dunn v. Blumstein, 405 U.S. 330, 341 (1972)**

Addressing the apparent forcing of implied domicile of plaintiff: forcing a compelled association by presuming plaintiff is domiciled within the State of Wisconsin directly interferes in the affairs of a political party, the plaintiff himself.  Plaintiff is his own independent political party and a sovereignty separate and distinct from the federal or state sovereignties.  A court of law is certainly *not* the proper forum, for instance, in which to question or politically ridicule one's choice of domicile, whether it be in an order or before a jury.  The court in this instance is compelling plaintiff to be in association with a political party not of his choosing, and is thereby violating plaintiff's First Amendment Right of Affiliation.

The Supreme Court said that the sovereignty of We The People is every bit as sacred as that of the states, so they should merit the same level of sovereign immunity from suit and dignity, especially in their choice of domicile, as that of the States.  To wit:

*__"The rights of individuals and the justice due to them, are as dear and precious as those of states.__  Indeed the latter are founded upon the former; and the*

---

9    Parrish v. Nikolits, 86 F.3d 1088 (11th Cir. 1996), cert. Denied, 117 S. Ct. 1818, 137 L.Ed.2d.. 1027 (U.S. 1997)

*great end and object of them must be to secure and support the rights of individuals, or else vain is government."*

[Chisholm v. Georgia, 2 .S. (2 Dall.) 419, 1 L.Ed. 40 (1793)

On Pg 8 of Dkt 157 in the appearance of bias, ("**Nemo iudex in causa sua**" ) Judge Peterson states:

> "But it's unnecessary to consider each of the alleged deprivations under the constitutional provision; I'll frame his claims using the most relevant constitutional provisions and theories.  The main thrust of his claims is that defendants didn't have a good reason to stop him on either April 6 and May 18, 2023, or to arrest him following the May 18 stop, so most of his claims boil down to whether defendants violated Grant's Fourth Amendment rights against unreasonable searches and seizures."

In his re-framing of the actual arguments to its liking, judge Peterson is arguing for the defendants. The court presumes that the authority (jurisdiction) of the defendants isn't in question and they only needed "a good reason to stop him".   Plaintiff does not consent and objects to a re-framing by the judge.  A main thrust of plaintiffs arguments are that defendants presumed that they had authority to hold plaintiff to State of Wisconsin Statutes specifically the statutes and Traffic Code and had jurisdiction in personam, when the facts in the unrebutted affidavit (Dkt 47 pg 3) show they did/do not. The summary effects of which are listed out on the top of the page of the summary of the affidavit (ibid. pg 2).:

### STATUS SUMMARY

1. Not domiciled on federal territory and not representing a corporate or governmental office that is so domiciled under Federal Rule of Civil Procedure 17. See Form #05.002 for details.
2. Not engaged in a public office within any government. This includes the civil office of "person", "individual", "citizen", or "resident". See Form #05.037 and Form #05.042 for court-admissible proof that statutory "persons", "individuals", "citizens", and "residents" are public offices.
3. Not "purposefully or consensually availing themself" of commerce with any government. Therefore, they do not waive sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. Chapter 97.

4. Obligations and Rights in relation to Governments:

4.1. Waives any and all privileges and immunities of any civil status and all rights or "entitlements" to receive "benefits" or "civil services" from any government. It is a maxim of law that REAL de jure governments (Form #05.043) MUST give you the right to not receive or be eligible to receive "benefits" of any kind. See Form #05.040 for a description of the SCAM of abusing "benefits" to destroy sovereignty. The reason is because they MUST guarantee your right to be self-governing and self-supporting.

4.2. Because they are not in receipt of or eligible to receive property or benefits from the government, they owe no CIVIL STATUTORY obligations to that government or any STATUTORY "citizen" or STATUTORY "resident", as "obligations" are described in California Civil Code Section 1428. This means they are not party to any contracts or compacts and have injured NO ONE as injury is defined NOT by statute, but by the common law. See Form #12.040 for further details on the definition of "obligations".

4.3. Because they owe no statutory civil obligations, the definition of "justice" REQUIRES that they MUST be left alone by the government. See Form #05.050 for a description of "justice".

5. For the purposes of citizenship on government forms:

5.1. Does NOT identify as a STATUTORY "citizen" (8 U.S.C. §1401 and 26 C.F.R. §1.1-1(c)), "resident" (alien under 26 U.S.C. §7701(b)(1)(A)), "U.S. citizen" (not defined in any statute), "U.S. resident" (not defined in any statute), or "U.S. person" (26 U.S.C. §7701(a)(30)).

5.2. Identifies themself as a "national" per 8 U.S.C. §1101(a)(21) and per common law by virtue of birth or naturalization within the CONSTITUTIONAL "United States***".

As seen above, plaintiff is completely private and is a "national" per 8 U.S.C. §1101(a) (21) and per common law by virtue of birth within the CONSTITUTIONAL "United States***".  A "national" is statutorily defined in TITLE 8 > CHAPTER 12 > SUBCHAPTER 1 > Sec. 1101, Sec. 1101. - Definitions – (a)(21) The term "national" means a person owing permanent allegiance to a state.  The "state" in the above definition is a state of the Union.  All states of the Union are "foreign states" with respect to federal government legislative jurisdiction, and are foreign to each other.[Black's Law Dictionary, 6th Edition p. 648]

This court may not use the Constitutional Avoidance Doctrine on this case. Plaintiff is domiciled outside the geographical boundaries of the State of Wisconsin and of the United States (Federal territories).  Plaintiff is PRIVATE and defendants are government officers or persons.  The charges are of Constitutional violations of plaintiff's rights, so therefore an Article III court is necessary.   Plaintiff does not claim any privileges originating from a civil statute that is not in the Constitution (aka a public right), and thus a privilege that can be regulated by the government and heard in a franchise court.  (Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858 (1983).  The violations claimed are additionally claimed against the defendants as individuals.  Additionally, if individually they are found to have committed violations outside their authority they are not afforded the protection of the State.

***

As for the testimony of Deputy Messner, it is a proven fact that all the testimony of Messner is suspect. He has been proven to be either a perjurer or at best highly unreliable as he does not check even his own reports, pictures or previous testimonies when he signed his only testimony in this case, a sworn declaration (Dkt 113), that has been proven to have false information. But in Judge Peterson's response opinion in (Dkt 151 pg4), the Court noted it was unpersuaded that the Defendants intentionally lied in their declarations, suggesting instead that the inconsistencies could be attributed to fallible human memory or other mistakes. Regardless of intent, the consequence remains: the Defendants' testimony is now fully suspect.

In particular, Officer Messner's sworn declaration claimed the vehicle lacked a license plate and that he took photographs to support this. However, a review of his own notes, filed reports, and submitted photographs contradicted this assertion. Despite having access to these materials, Officer Messner failed to consult them prior to testifying under oath. This is not merely a lapse of memory; it reflects recklessness and a failure to act in good faith.

A diligent officer, especially one testifying in federal court, is expected to verify the accuracy of their statements. Officer Messner's failure to do so renders his testimony untrustworthy in all respects. To credit any portion of his sworn declaration, especially to the detriment of the Plaintiff, constitutes an undue deference to the Defendants and an inequitable treatment of the Plaintiff.

This includes, but is not limited to, Officer Messner's hearsay communications with the Criminal Informant (C.I.) and with other individuals. Such statements, lacking reliability and foundation, should not be credited by the Court.

### E. Malicious Prosecution

There are indispensable parties missing from this malicious prosecution claim—

specifically, the Sauk County District Attorney and Assistant District Attorney, who were previously dismissed from the case. These individuals, in both their official and individual capacities, are integral to the claim and its underlying constitutional violations.

While the Court may have previously presumed absolute immunity as a basis for dismissal, such immunity does not apply in all circumstances, particularly when prosecutors act in an investigative or administrative capacity, or when they fail to intervene in an ongoing constitutional violation. In this case, the District Attorney's Office had the authority—and the responsibility—to evaluate the merits of the prosecution. Their continued pursuit of the case despite the absence of probable cause raises serious questions about deliberate indifference and policy, particularly under a potential *Monell* theory of liability.

Moreover, the fact that the Deputy Sheriffs allegedly claimed that "they do this all the time" suggests a possible pattern and practice of initiating prosecutions without probable cause, which further supports a *Monell* claim. Discovery and initial disclosures are necessary to determine whether this was an isolated incident or part of a broader policy or custom endorsed, condoned, or willfully ignored by supervisory officials, including prosecutors.

To the extent the prosecutors played a role in initiating or perpetuating this malicious prosecution without proper evidentiary basis, their actions fall outside the protective scope of absolute prosecutorial immunity. At the very least, the facts of this case warrant their reinstatement as defendants for the malicious prosecution claim.

## CONCLUSION

In conclusion, Section A., based on the fact that the deputies are not within their public

office of Deputy Sheriff based on the Wisconsin Constitution chapter IV, section 28 and Wis. Stat. 19.01, they are therefore not authorized to perform the actions they took against plaintiff.

In section B. the Analysis portion of the order, the court assumes that the defendants are occupying the office of deputy sheriff when they were not. This assumption has been challenged and newly discovered evidence has been presented that the deputies have not met the requirements of occupying the public office. This causes the entirety of the analysis to have to be re-evaluated.

In section C. above, related to initial disclosure, it appears that the court has systematically denied plaintiff his due process by its silence on enforcement of initial disclosures and schedule setting until after the deadline of dispositive motions for initial disclosures and deference to defendants by allowing them to use material that should have been disclosed to plaintiff in their summary judgment and now in further pleadings in violation of FRCP 26(a) and Fed. R. Evid 106.

In section D. above, (Undisputed Facts...), The court, in error, attempts to set the residency and domicile of the plaintiff and the effects thereof being something other than what is declared by the plaintiff in his affidavit of status (Dkt 47). The court in error with Ad Hominem arguments and needs to prove why plaintiff's arguments of his domicile and civil status (Dkt 47 generally) does not address directly the issue of the plaintiff's completely PRIVATE status and how Wis. Stat. Code do not apply to plaintiff. There is no evidence before the court that can alter the plaintiff's choice of domicile (ibid pg 3) nor is the court able to order the plaintiff to have a domicile of their choosing. Further it is up to defendants to established that defendants had in personam jurisdiction for their actions and that the Wis. Stats. applied to plaintiff, not the court.

Plaintiff is under the common law, and constitutional law. Plaintiff is completely

private and has no contracts with the State of Wisconsin.  (ibid.)

In section E. above the malicious prosecution claim also applies to DA Albrecht and ADA Arevalo for their roles and should be reinstated for this claim.

***

Wherefore plaintiff asks this court to reconsider its order of 3/17/2025 items 1,3,4, with the new evidence and argument presented above.

Plaintiff states the information is true to best of his ability and understanding under penalty of perjury.

Dated:  4/10/2025

/s  Caleb J. Grant

Caleb J. Grant
C/o E7973 Beth Rd
Reedsburg, WI 53959
CJGAgent@protonmail.com
608-386-3467

<u>Service</u><br>
Dalton Sjong, Brianna Meyer, Samuel Hall – Crivello, Nichols & Hall S.C.<br>
Daniel Peters – Wisconsin DOJ<br>
via ECF/CM